STATE OF IOWA, Appellee, v. JAMES DUNN, Appellant.

**INCEST:** Corpus Delicti—Corroboration—Sufficiency. Evidence re-
1   viewed, and held (a) to support a verdict of guilt of incest, and
    (b) to show sufficient corroboration of prosecutrix.

**WITNESSES:** Credibility—Character and Conduct—Effect. Prin-
2   ciple recognized that the mental attitude and conduct of a wit-
    ness goes only to the weight and credibility of the testimony given
    by the witness.

**CRIMINAL LAW:** Trial—Instructions—Character Evidence. On
3   the subject of character evidence, defendant's rights are fully
    protected by an instruction, (a) that, if the jury entertained
    a reasonable doubt of defendant's guilt, upon the whole record,
    they should acquit; and (b) that good character was sufficient to
    generate such doubt, even though, without proof of good char-
    acter, they would convict.

*Appeal from Decatur District Court.*—H. K. EVANS, Judge.

FRIDAY, DECEMBER 15, 1916.

APPEAL from a judgment of conviction on a charge of
incest.—*Affirmed.*

*C. W. Hoffman* and *V. R. McGinnis,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,*
Assistant Attorney General, and *G. W. Baker,* County Attor-
ney, for appellee.

GAYNOR, J.—I. The defendant was indicted, tried and
convicted of the crime of incest with his daughter, Cecil
Dunn. Judgment being entered upon the verdict, he ap-
pealed. The indictment charges that the
crime was committed on the 19th day of
March, 1915. The defendant relies for re-
versal upon the following points: First, that the evidence

1. INCEST: *corpus delicti:* corrob-
oration: suffi-
ciency.

was insufficient to justify the verdict; second, upon errors alleged to have been committed in rulings upon the admission of evidence; third, errors in instructions given to the jury. We take up these complaints in the reverse order of their assignment.

At the time of the happening of the matters complained of, the defendant resided with his family at the town of Weldon, in Decatur County. His family consisted of his wife, a son and a daughter. The daughter, Cecil, was at that time about 15 years of age. The son, Pearl, was about 18 years of age. They occupied a two-story building, sleeping rooms above, and living rooms below. At a time somewhat prior to the happening of the matter complained of, it appears that the family occupied the upstairs rooms for sleeping purposes, the father one room, the son another, and the daughter a third, the mother sleeping most of the time with the daughter. The daughter was not in the habit of early rising. It appears that, in passing from the room occupied by the father, it was necessary to pass through the daughter's room. She testified that her brother was in the habit of rising first, but sometimes the mother got up first and built the fires; that, after the brother and mother had gone to the lower rooms, the father was in the habit of coming and getting into bed with her; would claim to be loving her, and take improper liberties with her person. She testified that he had done these things nearly ever since she could remember; that, on the 19th day of March, 1915, he carried his purpose to the point of actual intercourse. She states her case as follows:

"Well, he came into my room and mamma had got up and gone down stairs, and then he came into my room and he wanted to love me, and I didn't want him to because I didn't think it very nice for a little girl to act that way. I didn't want him to do it, but still he kept on acting and wanting to. I told him so, and still he wouldn't stop. I was complaining in a loud whisper that it hurt, loud enough

to be heard down stairs. Mamma came to the door and called us to get up. As soon as he heard her coming upstairs he quit. She came right into the room where we were at. Father was in bed with me then. I just had on my night-gown. He had on his shirt, underclothes and a pair of light weight pants. I didn't tell my mother of what had happened. I just hated to. I couldn't pick up heart enough to tell her. I know she was worrying about something. I think it was about two days afterwards my brother came downstairs and asked what was the matter with her, and when he went out doors to do something, she asked me and I told her. I told my mother what my father had done. On the evening that I told my mother, I went to orchestra practice. I didn't want to stay, and then I didn't come back home any more. Haven't been back since. I went to John Pettis', my cousin, who lives right across the street. My mother went with me and stayed with me that night. It was about a week after the occurrence that I went before the grand jury."

It appears that the indictment was returned on the 26th day of March. On cross-examination she testified:

"I have been very bitter towards my father since he gave me a whipping, sometime before this occurred."

She further testified that her father slept downstairs during the first part of the year 1915, and until after he was arrested; that the defendant's father was ill and slept in the room downstairs, and the father, the defendant, slept down there on a cot to care for him; that during that time he came upstairs in the morning and slept part of the time; came up to her room. She said she couldn't tell how many times her father came to her room in the morning when he was attending the grandfather in the night in the room below; that, on those occasions, he would come to her room. She further testified that the father frequently called her, when the mother could not get her up. Called her to come

downstairs and help the mother; that she wouldn't do it; that she stayed in bed as long as she wanted to; that, when she went any place, she went regardless of her father and mother; that she took other people's advice, because the parents never came to her in a fatherly or motherly way; that that is the reason she says she went with Leonard McVey. She says:

"That is the reason I didn't pay any attention to them and ran with Leonard McVey because I had a better time with him, and because I always got beat around home if I didn't do anything. I tried to act decent. I was my own boss, and did as I pleased. I think it was just two days after this occurrence before I told my mother. I couldn't tell how long my father was in my room that morning. I should think 10 or 15 minutes. This was about 7 o'clock in the morning when he came in."

It appears that the mother was a witness before the grand jury, and was called as witness upon the trial. She was asked whether or not, about 7 o'clock on the morning of the 19th of March, 1915, just before she came down before the grand jury, in her home at Weldon, she didn't hear her daughter say in her room upstairs, "it hurts," and whether she went upstairs and found defendant in bed with her daughter. Her answer was, "Well, I don't see how I can, when the man wasn't at home."

"Q. Did you hear these things? A. Not that short a time before I came down here, I didn't. Q. Well, about that time? I don't say it was exactly the 19th, but about that time. A. I have heard her say that so blame much I couldn't say when it was. She is always hollering that word when any one of us touches her; don't make any difference if her grandfather touched her she hollered. Q. Did you go upstairs and find your husband in bed with her along about March, 1915? A. I sent him up there to wake her up. Q. Have you gone upstairs and found him in bed with her? A. I don't understand, not to say in bed with her, I didn't.

Q. Where did you find him?. A. He was sitting on the side of the bed with her. When I got up there he was sitting on the side of the bed. That was quite a while before I came down before the grand jury. It was not the morning I heard Cecil say, 'It hurts.' She is always saying that. Q. The morning you say you heard her say 'It hurts,' you went upstairs, did you ever hear her say 'It hurts' while she was upstairs and Dunn was up there with her, and you went up and found Dunn in bed with her? A. Well, I have answered it two or three times. I said I didn't know, I didn't take it that way. I have heard her say that lots of times. Q. Did you hear her say that when Dunn was upstairs with her in March, 1915? A. Yes, sir; I heard her say it. After I heard her, I didn't go upstairs every time. This was not in the morning. It was in the evening. I went upstairs then. I found him and her there. He was not in bed with her. He was in the room. He didn't sleep upstairs all winter. I didn't go upstairs, I went to the head of the stairs. I didn't go far enough to see where my husband was that morning. I didn't find him in bed with her. He was sitting on the side of the bed begging her to get up and go to school.''

She was then asked this question:

''I will ask you if it is true that you heard, on or about the 19th day of March, 1915, Cecil Dunn while she was upstairs, say 'It hurts,' then if you went upstairs and found your husband in bed with her, and she was dressed in her night clothes and he had on his pants—now was that true, did you hear that? A. I have answered it two or three times. I didn't look at the calendar. I never found him in bed with her. I heard her say that. He was sitting on the side of the bed begging her to get up. I never went upstairs and found him in bed with her in March, 1915, that I can remember of. Q. You say that you never found him in bed with Cecil Dunn at your home in Weldon in March, 1915? A. Not that I remember of. Q. Well you couldn't

remember it if you did? A. I don't remember. Nobody
would have brains enough to remember or not if they went
through with what I have since I have been married. Q.
Then did you ever find your husband in bed with Cecil in
March, 1915, she with her night clothes on and he with his
pants on? A. I told you I didn't remember ever seeing
them in bed with their night clothes on. She may have had
hers on, but he didn't. Q. Do you remember seeing her
with her night clothes on and he with his pants on, on March
19, 1915? A. No, sir; not in bed together. He was sitting on
the side of the bed, no more than I would do. If I had
taken a stick and licked her and made her mind me—that is
where I fell down."

She was asked this question:

"Did you stay all night with him on the night of March
19, 1915? Didn't you leave him there and go over to Mr.
Pettis' and stay all night? A. Didn't leave him for good.
I was persuaded to leave. My daughter never left home.
She wasn't at home when I left. We both stayed over at
Pettis' that night. I don't remember how long it was after
that before I came down before the grand jury; not very
long. I never left him to stay away. Had been away a
night or two before I came down before the grand jury.
I never left him to stay, but didn't stay with him between
the evening I went over to Pettis' and the time we came before
the grand jury. As a matter of fact, I stayed at home from
March 19th, being Friday, until next Tuesday. Went away
on Tuesday evening. At the time I left on Tuesday evening,
my husband had come home from sawing wood somewhere.
When my husband came in, I didn't get him his supper.
He got his own supper. Before I left that evening, I had
a talk with my husband about my daughter."

She then proceeds to say that the talk she had with her
husband was concerning the conduct of the daughter, and
not his conduct. She further claims that she knew nothing
of the claim against her husband at the time she went over to

Pettis'; that she learned it at Pettis'; that Pettises told her, and that was the reason she went before the grand jury; that Pettises told her that her daughter had made complaint to them.

This is the State's original case. In cases of this kind, the law does not require that the party injured be corroborated as required in some other cases.

The testimony of the defendant was to the effect that the defendant had always borne a good reputation for chastity in the community in which he lived; that the daughter was headstrong, wilful and disobedient; that the father severely punished her, about two months before this complaint was made; that she was very hostile to him by reason of the punishment; that he had forbidden her going with certain young men, among them Leonard McVey; that he had forbidden her going to the Fielder Hotel. It appears that this hotel was resorted to by young people for practicing with an orchestra; that Cecil was a member of this orchestra; that young boys would gather there and frolic with the girls. When this testimony is analyzed, it fails to show any substantial evidence against the character of these young men, or against this place. No witness is called to show that this place, frequented by the girl, was an objectionable place, and the defendant himself, when on the stand while complaining of the girl's visiting this place, says:

"I am acquainted with the reputation of the place (being the hotel), during the time the Fielders kept it. It was poor, bad talked about. I heard some pretty bad talk about Mrs. Fielder. Didn't think much of her reputation, would call it bad. The boys that frequented the place would be Leonard McVey, Miles Parr, Wayne Parr and several others. I objected to my daughter keeping company with Leonard McVey. He talked pretty bad on the streets, swore pretty bad on the streets. I didn't think he was a fit boy for her to be with. She was young. Thought from his conduct he was not a proper person for her to be in company with. I

went up there after her twice. I whipped her on account
of her visiting that place, about two months before this
occurred. The reason I whipped her was, when I came home
from work, I asked where she was. My wife said she went
up town to see me to get some money to go to a picture show.
I went on the street and couldn't find her. I thought I
would find her at the hotel. Walked up on the door step,
heard John Fielder say, 'Leonard McVey, you and Cecil had
better cut that out.' I stood a few minutes and then opened
the door and stepped in. Cecil was lying kind of across the
table, Wayne Parr was over her, on the other side of Cecil.
I came in and said, 'Mamma wants you home.' She says,
'Well.' I afterwards saw her on the street with Leonard
McVey going north from the hotel across up to the sidewalk
by the hotel. Leonard went west and she went home. I went
in and said, 'Cecil, where have you been?' She wouldn't tell
me. She said, 'I won't do it.' I said, 'Cecil, I don't want
to have to whip you. You know if I have to whip you I will
have to whip you harder than I want to. You must tell me
where you have been.' I went out and got a switch and
whipped her a little. She said, 'If you quit whipping me,
I will tell you where I have been.' She says, 'I was down
there in the alley watching the pictures, I and Leonard
McVey.' I said, 'Didn't I tell you I didn't want you to go
with Leonard McVey?' She said, 'No papa, I will never go
with him any more.' After that I saw her with McVey,
standing on the walk in front of my door.''

Speaking of the 23d of March, when he came home and
his wife didn't get him any supper, he says that, while he
was eating his supper, she spoke to him about Cecil's run-
ning to the hotel, and being ruined. ''She said she was
afraid I was the cause of it, I didn't keep her away. When
I came home that night, my daughter was just going out of
the house. I went down town and, when I came back, neither
my wife nor my daughter were there. She didn't come
back home that night. My wife and daughter left home, and

the next thing I knew, they came down here and had me indicted.'' He denies having any intercourse with his daughter.

We have not attempted to set out all the evidence offered by both parties, but sufficient to show that the record presents a fair question for the jury. The prosecuting witness'

2. WITNESSES: credibility: character and conduct: effect. testimony is straight and to the point, and, if believed to be true, establishes in the mind an abiding conviction of the guilt of the defendant. Whether she told the truth or not was for the jury's determination. Evidence of her mental attitude and her conduct goes only to the weight and credibility of her testimony, tending to show a motive to falsify, but it is not sufficient to destroy the testimony, or leave it without probative force. All the witnesses, including this complainant, were before the jury. They saw them and heard them testify.

It will be noted from the record that the daughter claims that she told her mother of her father's conduct on Tuesday, the 23d. The father testifies that, when he came home on the night of the 23d, he found his daughter just leaving the home; his wife in a bad mood. She refused to get him supper. She talked with him about the girl. She left that night; afterwards went before the grand jury with her daughter, and did not return until after he was indicted. Her testimony tends strongly to corroborate the daughter's in all that she testified to concerning the conduct of the father. She was apparently a very unwilling witness on the trial. Her mental attitude had changed. After much questioning, she showed herself possessed of a knowledge of conditions about that home strongly corroborating the daughter's testimony as to what occurred on the 19th, though she seeks to explain it away. Upon this record, we not only think that the jury was justified in returning the verdict that it did, but we think it had ample support in the evidence, from our viewpoint, after a careful reading of the record.

II. It is next contended that the court erred in the

admission of evidence. Upon this point, we have to say that an examination of the record shows unusual care on the part of the court to protect every right of the defendant, and to guard all avenues through which prejudicial matter might reach the jury, except in so far as a reproduction of what actually happened might have in producing that effect. No error here.

III. It is urged that the court erred in its fifth instruction. The only objection urged to this instruction before it was given was that it should say that the evidence as to the good character should be considered in connection with all the other evidence, in determining the guilt or innocence of the defendant. That is true. We think the instruction, when analyzed, though not couched in these words, conveys to the jury the idea that evidence of good character is sufficient to generate a reasonable doubt, and entitle the defendant to acquittal, even though, without such proof of good character, they would convict. The jury were told in another instruction that, if they entertained, upon the whole record, a reasonable doubt of the defendant's guilt, they should acquit him; that good character was sufficient to generate that doubt and entitle the defendant to an acquittal, even though, without proof of good character, they would convict. We think the instruction fully protected the rights of the defendant, and was a fair expression of the law, and that defendant has no grounds for complaint.

*3. CRIMINAL LAW: trial: instructions: character evidence.*

Upon the whole record, we think the case must be, and is,—*Affirmed.*

EVANS, C. J., LADD and SALINGER, JJ., concur.